**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DAWN CALDWELL, | ) | |
| | ) | CASE NO.   1:07-cv-1648 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE VECCHIARELLI |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | **<u>MEMORANDUM OPINION & ORDER</u>** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Dawn Caldwell ("Caldwell"), challenges the final decision of the

Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Caldwell's

claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act

("Act"), 42 U.S.C. §§ 423 and 1381(a).  This Court has jurisdiction pursuant to 42 U.S.C.

§ 405(g).  This case is before the undersigned United States Magistrate Judge pursuant

to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, this Court VACATES the final decision of the

Commissioner and REMANDS the case to the ALJ for further action consistent with this

opinion.

## I.  Procedural History

On August 27, 2001, Caldwell filed an application for SSI.  Her application was denied initially and upon reconsideration.  Caldwell timely requested an administrative hearing.

Administrative Law Judge Nino Sferrella ("ALJ") held a hearing on September 29, 2004.  Caldwell was represented by counsel and testified on her own behalf.  Evelyn Sindelar testified as a vocational expert ("VE").  The ALJ issued a decision on February 28, 2005, finding that Caldwell was not disabled.  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

Caldwell filed an appeal to this Court on June 5, 2007.  Caldwell claims (1) the ALJ decision that Caldwell's conditions do not meet or equal a listed impairment is not supported by substantial evidence and (2) the ALJ erred in analyzing the treating physician's opinion and failed to give it proper weight.

## II.  Evidence

A.    *Personal and Vocational Evidence*

Caldwell was born on November 17, 1967 and was 36 years old at the time of her hearing.  She is a "younger" person within the meaning of 20 C.F.R. § 404.1563(c).  Caldwell attended high school through the 11th grade.  She has been a homemaker and has no past relevant work experience.

B.    *Medical Evidence*

On July 10, 2000 Domingo Ramos, M.D., Caldwell's treating physician, reported that Caldwell had "a lot of pain" in both knees and some pain in her right hand.  Transcript ("Tr."), Doc. No. 11 at 183.  X-rays of her feet and knees taken on February 22, 2001

2

revealed a remote fracture fragment at the base of the right fifth metatarsal and very mild degenerative changes in the knees.  Tr. at 193-94.  On September 20, 2001 Caldwell complained of swelling and pain in her legs and back pain when she used her arms.  Tr. at 151.

Laurence Lembach, D.P.M., examined Caldwell on September 27, 2001 at the request of Dr. Ramos.  Tr. at 126-29.  Dr. Lembach found palpable pedal pulses bilaterally, a reduction of vibratory sensation on the left lateral ankle, significant pain on inversion of her right foot with peroneal spasm, and excruciating pain on the base of the right fifth metatarsal.  He recommended a foot orthotic and possible use of a Cam Walker until the pain subsided.  On September 28, 2001 Dr. Lembach reported to the Bureau of Disability Determination ("the Bureau") that Caldwell has recurrent pain and a limp in her right foot, has an ataxic gait in her right foot and leg, uses a medically necessary ambulatory aid for all ambulation, and requires surgery to correct the problem.  He reported that Caldwell could not stand, walk, or carry objects.

Wilfredo M. Paras, M.D., examined Caldwell on January 28, 2002 at the request of the Bureau.  Tr. at 130-32.  Caldwell complained of constant pain in the neck, low back, knees, shoulders, and right foot and reported that the pain was worsened by cold and humidity.  Caldwell also reported intermittent swelling of the fingers of both hands, knees, and right foot, and generalized muscle aches and pain.  Physical examination revealed a short, moderately obese female who walked slowly, used a walking brace on her right foot, and wore a neck brace.  There was no sign of edema or varicosity in her extremities.  Dr. Paras also found reduced deep tendon reflexes bilaterally, slight tenderness at the base of the right fifth toe, and distal pulses reduced to 2+.  There was no joint heat or swelling,

3

muscle spasm, or muscle atrophy.  Caldwell's ability to grasp, manipulate, and perform fine coordination was unimpaired.  Dr. Paras's impressions included a history of rheumatoid and osteoarthritis, a history of hypertension adequately controlled by medication, a history of bronchial asthma, a history of chronic pain and swelling of the right foot with x-ray evidence of a failed union of the apophysis, a history of chronic anxiety, a history of fibromyalgia, and obesity.  Caldwell reported living with her husband and six children, ages 8-16 years.  She said that she could not drive, was limited in her work activities by joint pain and muscle aches, that sitting for 20 minutes or standing for five minutes aggravated her low back pain, and that she avoided bending.  She stated that she could walk for up to 30 minutes and lift no more than five pounds with each hand.  She was limited to the first floor of the house. Caldwell reported that she tried to do household chores despite the pain and that medication made the pain tolerable for her to do things for a time.  Her family helps her with chores.   Caldwell's medications included Daypro, Elavil, Darvocet, Flexeril, Cozaar, Tranxene, and an Albuterol inhaler.

J.A. Hardin, M.D., a state agency physician, reviewed Caldwell's record on February 21, 2002.  Tr. at 230-35.  He opined that Caldwell could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk for two hours in an eight-hour work day, sit about six hours in an eight-hour work day, and was limited in her ability to push or pull with her lower extremities.  He also opined that Caldwell's allegations were only partially credible because "she is able to perform her daily activities and care for her children."  Tr. at 234. Hardin also reported that there was no statement in the record by a treating or examining physician regarding Caldwell's physical capacities.  Cyndi Lynn Hill, M.D., confirmed Dr. Hardin's assessment on September 16, 2002.

4

A March 6, 2002 x-ray of Caldwell's lumbosacral spine revealed no acute bony abnormalities.  Tr. at 345.

On May 23, 2002, Deborah Koricke, Ph.D., a clinical psychologist, examined Caldwell at the request of the Bureau.  Tr. at 136-39.  Caldwell reported going to sleep at 11 p.m., rising at 7 a.m., and having no trouble sleeping.  She generally awoke, however, with pain and struggled to deal with chronic pain throughout the day.  She also reported doing household chores, errands, grocery shopping, and child care but that her children helped her with heavier chores.  Caldwell also told Dr. Koricke that she spends most of the time with her children coloring, watching movies, and playing video games and that she attends church weekly, watches television, and socializes with her family.

An x-ray of Caldwell's right foot taken on May 28, 2002 revealed a non-union fracture at the proximal base of the fifth metatarsal.  Tr. at 191.  MRI imaging of Caldwell's left knee on July 15, 2002 revealed complete disruption of the anterior cruciate ligament, disruption of the posterior cruciate ligament, and osteoarthritic changes.  Tr. at 339.

On June 30, 2002 Dr. Ramos completed a questionnaire assessing Caldwell's condition.  Tr. at 140-43.  When asked to describe any clinical abnormalities of gross anatomical deformities present, he listed "multiple joint pains as a subjective symptom." Tr. at 141.  Elsewhere, he noted muscle tenderness, reduced spinal tension and flexion, and a slow gait but no need for an ambulatory aid.  He did not find any limitations in Caldwell's ability to engage in gross manipulation.  Although he noted pain and an open fracture in Caldwell's right foot that caused Caldwell to favor one side while walking, Dr. Ramos stated that she retained full weight bearing capability.  He noted that Caldwell did not use an ambulatory aid.

5

In about July 2002 George Essig, M.D., Caldwell's treating orthopedic surgeon, reported to the Bureau that Caldwell suffered from pain, swelling, weakness, limited motion, and muscle atrophy in her foot and swelling, crepitus, reduced range of motion, and muscle atrophy in her knee.  Tr. at 226-28.  He found Caldwell's strength in her foot dorsiflexors and quadriceps to be 4/5.  He also reported that Caldwell's gait was antalgic, requiring her to use a cane and making walking difficult.  Dr. Essig opined that she should return to full weight bearing by October 21, 2002.  He found Caldwell's ability to engage in fine and gross manipulation to be unimpaired.

On January 14, 2003 Dr. Essig completed a residual functional capacity assessment of Caldwell.  Tr. at 236-37.  He limited Caldwell to lifting 10 pounds and standing or walking 1 hour in an eight-hour day.  He also opined that Caldwell could rarely or never climb, balance, stoop, crouch, kneel, crawl, and push or pull and could only occasionally reach, handle, and feel.  He asserted that Caldwell could not be exposed to temperature extremes, chemicals, dust, noise, or fumes.  He noted that Caldwell had been prescribed a cane.  According to Dr. Essig, Caldwell also needed afternoon breaks in addition to morning and lunch breaks but could sit for an unlimited period of time.

Dr. Essig treated Caldwell on February 19, 2003 for pain in both knees.  Tr. at 238.  A bone stimulator used to treat the non-union fracture in Caldwell's right foot was only minimally effective.  An MRI of the right knee revealed a partial tear of the meniscal capsular junction of the medial meniscus.

On September 8, 2003 Caldwell reported to Dr. Ramos pain in the right foot and both knees.  Tr. at 283.

Dr. Ramos completed a physical capacity assessment of Caldwell on December 20,

6

2003.  Tr. at 310-10A.  He opined that Caldwell was unable to carry more than five pounds or two pounds frequently; could walk only for 30 minutes in an eight-hour day but only for 10 minutes without interruption;  could sit for one hour in an eight-hour day but only for 30 minutes without interruption; could rarely or never climb, balance, stoop, crouch, kneel, crawl, reach, handle, or push and pull and could only occasionally feel or engage in gross manipulation.  He asserted that she needed afternoon breaks in addition to a morning break and lunch break and would need to elevate her legs to stool level.  He noted that a cane and walker had been prescribed for her.

On January 12, 2004 Dr. Essig noted that Caldwell had complained of swelling, pain, and crepitus in the left knee.  Tr. at 367.  She was given and injection and fitted with a hinged Don Joy knee brace on her left knee.  An x-ray of the left knee revealed joint space narrowing and marginal osteophyte formation.  An x-ray of the right foot showed a non-united fracture.  Tr. at 319.  Otherwise, there was no evidence of acute fracture or bony destruction in knees, ankles, legs, or feet.  Tr. at 319.

Dr. Ramos completed a second residual functional capacity assessment of Caldwell on April 8, 2004.  Tr. at 252-53.  He opined that Caldwell was unable to carry more than two pounds; could walk only for two hours in an eight-hour day but only for 30 minutes without interruption; could sit for two hours in an eight-hour day but only for 30 minutes without interruption; could rarely or never climb, balance, stoop, crouch, kneel, crawl, reach, handle, or push and pull and could only occasionally feel or engage in fine or gross manipulation.  He also asserted that Caldwell could not be exposed to heights, moving machinery, temperature extremes, chemicals, dust, noise, or fumes. Dr. Ramos stated that Caldwell needed afternoon breaks in addition to a morning and lunch break, but he no

7

longer stated that she needed to elevate her legs.  He noted that a cane and knee brace had been prescribed for Caldwell.

Dr. Essig examined Caldwell on April 21, 2004.  Tr. at 366.  Caldwell reported to his office wearing a soft cervical collar.  Dr. Essig told her that this was not a good idea, because the muscles in her neck might atrophy.  Examination of the cervical spine revealed reduced range of motion with paracervical spinal muscle spasm.  Examination of the left knee revealed 1+ effusion with marked crepitus of the patellofemoral joint. a positive Murray's sign, and decreased range of motion.

Dr. Essig completed a second residual functional capacity assessment of Caldwell on April 22, 2004.  Tr. at 364-65.  He again limited Caldwell to lifting 10 pounds and standing or walking one hour in an eight-hour day.  He also opined that Caldwell could rarely or never climb, balance, stoop, crouch, kneel, crawl, and push or pull and could only occasionally reach.  Dr. Essig placed no limitation on Caldwell's ability to sit.  He also asserted that Caldwell could not be exposed to chemicals, dust, noise, or fumes.  Dr. Essig noted that Caldwell had been prescribed a cane and a knee brace.  He reported cervical paraspinal spasms, effusion and reduced range of motion in both knees, torn anterior and posterior cruciate ligaments and severe osteoarthritis in the left knee, and pain and swelling in the right foot due to the non-union fracture.

Dr. Ramos examined Caldwell on May 27, 2004 and noted chronic pain in the left elbow.  Tr. at 381.  On June 8, 2004 he reported that Caldwell suffered from intermittent edema of both hands and feet.  Tr. at 380.  On June 22, 2004 Dr. Ramos repeated his diagnosis of rheumatoid arthritis, chronic polyarthritis, and fibromyalgia.  Tr. at 379.

Dr. Essig examined Caldwell on July 12, 2004.  Tr. at 387.  Caldwell reported pain

8

in her elbow that worsened when she pushed through resistance.  Dr. Essig diagnosed her as suffering from lateral epicondylitis of the left elbow.

On August 18, 2005 Dr. Ramos completed a third physical capacity assessment of Caldwell.  Tr. at 400-01.  He opined that Caldwell was unable to carry more than five pounds; could walk only for one hour in an eight-hour day but only for 15 minutes without interruption; could sit for seven hours in an eight-hour day but only for 20 minutes without interruption; could rarely or never climb, balance, stoop, crouch, kneel, crawl, reach, handle, or push and pull and could only occasionally feel or engage in fine or gross manipulation.  He also asserted that Caldwell could not be exposed to heights, moving machinery, temperature extremes, chemicals, dust, noise, or fumes.  Dr. Ramos asserted that Caldwell needed breaks in addition to a morning and lunch break.  He noted that a walker and a breathing machine had been prescribed for Caldwell.

*C.    Hearing testimony*

Caldwell testified at her hearing in September 2004 that she was unable to work due to arthritis, fibromyalgia, and problems with her kidneys, knees, and back.  Tr. at 515-33.  She told the court that she took medication to treat pain for fibromyalgia but that she did not do any stretching.  Caldwell reported that it was difficult to walk and that she walked with a cane prescribed by Dr. Ramos and a left knee brace prescribed by Dr. Essig.  Tr. at 521-22.  She also reported suffering from pain in her neck, knees, shoulders, head, feet, and hands. Tr. at 518-19, 524-25).  According to her testimony, pain in her hands makes writing difficult, and pain in her hips and back interrupts her sleep.  Tr. at 529.  She further testified that her feet and knees swell when she walks, she was able to stand or walk for about 10 to 15 minutes, and could sit uninterrupted for about 15 minutes.  Tr. at 529-30.

9

Upon conclusion of Caldwell's testimony, the ALJ posed a hypothetical question to the VE. The hypothetical question posed was not clear. According to the transcript, the following colloquy occurred between the ALJ and the VE:

> Q      All right. Thank you. That's all I know. The thing is there are not tests for the hearing for your, she has certainly just physical problems recognized on the review and obviously the record. For the two existing doctors, Essick [sic] have given us these views and the affects [sic] with her knees, hand or right foot. That's 11F and 15F. I had it, just different things at different times so let me just make sure the statement is [INAUDIBLE]. So, basically he's saying that sedentary only in 11F and the 16F, I believe, I believe subject ten knows her, no sitting but walking only one I approve. No spine films found, [INAUDIBLE] bone. And there's the, no question in pulling, [INAUDIBLE]. Can't do it. Reaching hand the auxiliary to the face and the nose too. Reaching hand in the field, not sure why. And [INAUDIBLE]. Those limitations with prolonged physical limitations, would you have an opinion whether such a person, as in 11F, could perform work [INAUDIBLE] at what times.

> A      Yes, Your Honor. At the sedentary level. One would be the --

> Q      I appoint your [INAUDIBLE]. Let me come back to that. Was my, I guess my main question is, if I accept what it says she can do, no climbing, bouncing, stooping, crouching, kneeling, and crawling. And only occasionally can she do [INAUDIBLE] as in, you wrote and you wrote [INAUDIBLE] machinery tempestry [phonetic], drapes. I think only levels as totally, or to something degree there's [INAUDIBLE].

> A.      No, Your Honor. There are jobs that fill those spots.

> Q      Because if we give her basically the same, I think they have greater listings, can't happen. If you reduce the lifting to a medium level but we possibly, to our understanding, the lower extremities, the lower extremities, [INAUDIBLE] that's probably her foot, the right foot, and no climbing. So, there's not as many limitations there. So, there's a prior range of sedentary with increased lifting?

> A      Yes sir.

> Q      The most, at 50 now's changed, 59, which are lifting in, no more lifting past five pounds. Standing and walking, total of six. Sitting [INAUDIBLE] generally, and then, [INAUDIBLE] we have two of those?

> ATTY:      Yes sir. They're both at 14F. One page --

> ALJ:   In one place she said one year and one place she said two.

10

ATTY:        Yeah.

BY ADMINISTRATIVE LAW JUDGE:

Q        I forgot what I said the first time.  15F1, in which Dr. Essick [sic] relays that this foot, [INAUDIBLE] this year, again he states that no, no sitting limitation [INAUDIBLE] and the same thing, it says no climbing, balancing, crouching, crawling.  Occasional reaching, reaching, handling for [INAUDIBLE].  These are frequently [INAUDIBLE].  Foot, medical defined.  Then he gives some explanation on, oh, elbows.  That's the reason for the, I think, the reaching.  With regard to that RFC, Ms. Sindlarz [sic], for a duration sedentary?

A        Yes sir.

Q        Thank you.  And that's because of the, the elbows in place.  Handling and feeling has to do with the lifting ain't even like that.  To lift, it ain't that, with those basic limitations, some limitations on the use of the hands, which have to be determined, I'm not sure why, and or reaching.  And the other, all the other limitations that, would you have an opinion on whether what jobs would still be available with limitations, asthma, within the skilled [INAUDIBLE] by vocational credit.  Definition in your dictionary of occupations these limitations that we're now describing.

A        Yes.  There are.

Tr. at 532-35.  The VE opined that a person with the limitations posed by the court could perform the jobs of order clerk, grading clerk, and telephone solicitor.  When Caldwell's attorney added the limitations of only occasional fine and gross manipulation and a sit/stand option, the VE maintained that such a person could still perform the jobs he had mentioned.

### III.  Standard for Disability

A claimant is entitled to receive SSI benefits under the Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable

11

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### IV.  Summary of Commissioner's Decision

In relevant part, the ALJ made the following findings:

1.   The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2.   The claimant's obesity, osteoarthritis and tear of the meniscus of the right knee, low back pain, history of neck pain, diabetes, shoulder pain, and a right

foot fracture with non-union are considered "severe" based on the requirements in Regulations 20 CFR § 416.920(c).

3.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4.  The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

5.  The claimant has the residual functional capacity for a full range of sedentary exertion.

6.  The claimant has no past relevant work (20 CFR § 416.965).

7.  The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 416.963).

8.  The claimant has "a limited education" (20 CFR § 416.964).

9.  The claimant has the residual functional capacity to perform the full range of sedentary work (20 CFR § 416.967).

Tr. at 20-21.

After determining that Caldwell retained the functional capacity for a full range of sedentary work, the ALJ turned to Table No. 1 at 20 C.F.R. Pt. 404, Subpart P, App. 2, § 201 ("Table 1").  The ALJ then determined that rule 201.24 in that table best described Caldwell's condition.  Rule 201.24 applies to younger individuals with limited or less education who are literate and can communicate in English, are unskilled or have no previous relevant work experience, and are capable of performing the full range of sedentary work.  Rule 201.24 dictates a finding that such an individual is not disabled.

10.  Based on an exertional capacity for sedentary work, and the claimant's age, education, and work experience, a finding of "not disabled" is directed by Medical-Vocational Rule 201.24.

11.  The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 416.920(g)).

13

Tr. at 21.

V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

VI.  Analysis

Caldwell claims the ALJ erred (1) in finding that Caldwell's conditions did not meet or equal an impairment listed at 20 C.F.R. Part 404, Subpart B, Appendix 1, §1.02A ("§ 1.02A") or 20 C.F.R. Part 404, Subpart B, Appendix 1, § 1.06 ("§ 1.06"); and (2)  in his analysis of the opinions of Caldwell's treating physicians and in the weight he gave those opinions.  The Commissioner denies that the ALJ committed significant error.  Each of Caldwell's alleged errors shall be examined separately.

A.    Whether the ALJ erred in finding that Caldwell did not meet the listing at § 1.02A or § 1.06

The listing at § 1.02A describes a disability for certain musculoskeletal conditions.

14

The subsection provides as follows:

> 1.02 *Major dysfunction of a joint(s) (due to any cause)*:  Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:
> A.  Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

The listing at § 1.06 describes a disability due to a non-solid fracture:

> 1.06 *Fracture of the femur, tibia, pelvis, or one or more of the tarsal bones.* With:
> A. Solid union not evident on appropriate medically acceptable imaging and not clinically solid:
> and
> B. Inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur or is not expected to occur within 12 months of onset.

Section 1.00B2b describes "ambulate effectively" as follows:

> *To ambulate effectively*, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school.  Therefore, examples of ineffective ambulation include, but are no limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk effectively about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

The subsection also defines "ineffective ambulation" as "having insufficient lower extremity functioning . . .  to permit independent ambulation without the means of a hand-held assistive device(s) that limits the functioning of both upper extremities."

Caldwell argues that the ALJ's findings jump from considering the severity of her impairments to past relevant work without evaluating her impairments in relation to the

15

listings.  In particular, Caldwell contends that she meets the listing at § 1.02A by virtue of her arthritis in both knees, non-union fracture in her right foot, and ineffective ambulation and that she meets § 1.06 by virtue of her non-union fracture in her right foot and ineffective ambulation.  Caldwell notes that the record demonstrates her continued difficulty in walking, her required use of a cane and knee brace, and her difficulty sustaining a reasonable walking pace over sufficient distance to carry out activities of daily living.

The ALJ's findings included the finding that Caldwell's impairments "do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4." Tr. at 20.  In reaching this finding, the ALJ wrote in relevant part:

> The medical evidence indicates that the claimant is obese, has osteoarthritis and a tear of the meniscus of the right knee, a history of low back pain, neck, and shoulder pain, diabetes, and a remote fracture with the non-union of the right fifth metatarsal, impairments that are "severe" within the meaning of the Regulations but not "severe" enough to meet or medically equal, either singly or in combination to [sic] one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  There is insufficient evidence of ineffective ambulation because of the foot fracture and knee conditions. The claimant is able to walk without limits with the use of a knee brace and her treating physician noted in May 2002 that she was full weight bearing.  The record shows she has restricted range of motion throughout the major joints and that there are no neurological deficits.

Tr. at 17.  The Commissioner argues that the ALJ's opinion was consistent with those of the state agency physicians and was supported by Dr. Ramos's opinion of June 2002 that Caldwell did not require an ambulatory aid, Dr. Essig's opinion that Caldwell was fully weight-bearing by October 2002, the opinion of her treating physicians that she could walk from one to two hours in an eight-hour workday, the opinion of state agency physicians that she could walk six hours in an eight-hour workday, and Caldwell's own accounts that she could engage in grocery shopping, running errands, performing household tasks, caring for children, and attending church.

16

Consistency with the opinions of state agency physicians is of little use if those opinions conflict with the properly-supported opinions of treating physicians or are based in inadequate evidence.  The ALJ accepted the opinion of Dr. Essig, a treating physician, and that opinion contradicted the opinions of the state agency physicians in every important respect.  In addition, the state agency physicians reported that there was no opinion of a treating or examining physician regarding Caldwell's physical capabilities in the record on February 2002.  Thus, the state agency physicians did not see Dr. Lembach's September 2001 report to the Bureau in which he asserted that Caldwell has recurrent pain and a limp in her right foot, has an ataxic gait in her right foot and leg, used a medically necessary ambulatory aid for all ambulation, and required surgery to correct the problem.  They also missed his opinion that Caldwell could not stand, walk, or carry objects.  As the state agency opinions failed to include the most complete assessment of Caldwell's physical capacities up to the date of the state agency assessment, those opinions are of little value.[1]

Dr. Ramos, indeed, did note on June 30, 2002[2] that Caldwell did not use an ambulatory aid and had full weight bearing capability.  He also noted, however, that Caldwell experienced pain on walking and favored one side.  Moreover, by December of 2003 he asserted that a cane and walker had been prescribed for Caldwell.

The Commissioner's argument that the ALJ's opinion was consistent with Dr. Essig's opinion that Caldwell was fully weight-bearing by October 2002 is also problematic.  Dr.

---

[1]  Indeed, the ALJ rejected the state agency physicians' opinions because the physicians did not have full access to the record.  *See* tr. at 18.

[2]  Not May 2002, as the ALJ asserted.  There is no opinion in May 2002 saying that Caldwell is fully weight-bearing.

17

Essig did *not* opine that Caldwell was weight-bearing by October 2002.  In July 2002 Dr. Essig *predicted* that although Caldwell's gait was ataxic, requiring her to use a cane and making walking difficult, she *should* return to full weight bearing by October 21, 2002.  Thus, within a month of Dr. Ramos's finding that Caldwell did not use an ambulatory aid and was fully-weight-bearing, Dr. Essig found that she was required to use a cane to walk.  There is nothing in the record that indicates that Caldwell returned to full weight bearing by October 21, 2002 or by any other date.  Simply put, the assertion that evidence shows that Caldwell was fully weight bearing in October 2002 is erroneous.

The Commissioner notes that the ALJ's finding that Caldwell does not meet the requirements of any listing accords with the opinion of her treating physicians that she could walk from one to two hours in an eight-hour workday.  This is of marginal relevance, however.  The listing at § 1.02A is met if the claimant is unable to sustain a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living, unable to walk a block at a reasonable pace on rough or uneven surfaces, or unable to climb a few steps at a reasonable pace with the use of a single hand rail.  That Caldwell is able to walk between one-eighth and one-quarter of an eight-hour day does not speak to any of these limitations.  This is particularly problematic because the record is clear that Caldwell walks slowly and with a limp, tires easily, and has serious problems with stairs.

The Commissioner's argument that the ALJ's findings agree with Caldwell's own accounts that she could engage in grocery shopping, running errands, performing household tasks, caring for children, and attending church also has serious shortcomings.  Caldwell indicated that most of the time spent with children, the youngest of whom was eight years old, consisted of coloring, watching movies, and playing video games.  Neither

18

this nor attendance at church proves that she is capable of ambulating effectively.  Caldwell also said that her children helped her with heavier chores.  In considering Caldwell's ability to carry out tasks and take trips, left at issue is the manner in which Caldwell carries out her errands.  It is unclear whether an ability to perform these tasks with help necessarily demonstrates effective ambulation.

There are other problems with the ALJ's opinion.  First, the opinion notes Caldwell's allegations of fibromyalgia and her treating physicians' multiple diagnoses to that effect, then fails to consider fibromyalgia when assessing Caldwell's allegations of limitations due to pain.  Second, the ALJ wrote, "There is insufficient evidence of ineffective ambulation because of the foot fracture and knee conditions."  Yet, there is objective evidence in the record that by the time of the hearing Caldwell's right foot and left knee suffered swelling and reduced range of motion.  In addition, the record is clear that Caldwell's gait was ataxic and that her left knee revealed 1+ effusion and a positive Murray's sign.  Moreover, the ALJ wrote, "The claimant is able to walk without limits with the use of a knee brace and her treating physician noted in May 2002 that she was full weight bearing."  Not only was the ALJ's assertion that Caldwell was weight bearing contradicted by an additional opinion within 30 days, but *the ALJ completely ignored Caldwell's use of a prescribed cane*.  Thus, the ALJ's opinion minimized the causes of Caldwell's foot and knee problems and erred repeatedly as to the alleged disability's effects on her ambulation.

Considering the ALJ's errors in assessing Caldwell's ability to ambulate effectively, it cannot be said that the ALJ's opinion that Caldwell's impairments did not meet or equal any of the listings was supported by substantial evidence.  However, neither can it be said the record demonstrates that Caldwell meets the requirements of either § 1.02A or § 1.06.

The record does not demonstrate that she meets or does not meet the requirements of §
1.00B2b.  What is necessary, therefore, is to remand the case to the ALJ to consider all of
Caldwell's limitations properly in determining whether Caldwell meets or equals any of the
listings.  The ALJ may need to develop the record further in deciding whether Caldwell is
able to ambulate effectively as defined by § 1.00B2b.

B.    *Whether the ALJ erred in his analysis of the opinions of Caldwell's treating
      physicians and in the weight he gave them.*

Caldwell argues that the ALJ erred in dismissing the opinion of Dr. Ramos as
unsupported by objective evidence and erred in adopting Dr. Essig's opinion but failing to
consider all the limitations described in that opinion.

In rejecting the opinion of Dr. Ramos, the ALJ explained his decision as follows:

> Although the opinion of a treating source on the nature and severity of the claimant's
> impairments will be given controlling weight if well supported by medical acceptable
> [sic] clinical and laboratory diagnostic techniques, his opinion is not supported by
> clinical findings.  Specifically, Dr. Ramos treatment [sic] records show that he
> examined the claimant frequently (twice a month) for symptoms related to her
> asthma and bronchitis, chronic cough, ear pain, and sinus drainage.  Dr. Ramos'
> records show no treatment or laboratory studies for arthritis, fibromyalgia, or other
> diagnosed joint abnormalities.  Yet his assessment is based on the same.  A review
> of the assessment completed at the same time as Dr. Essig's opinion . . . shows that
> Dr. Ramos' opinion is far more limiting, in spite of no apparent worsening in the
> claimant's medical status.  Therefore, I do not accord Dr. Ramos opinion [sic] n
> claimant's residual functional capacity controlling weight, as it is not accepted as an
> accurate assessment.

Tr. at 18.

It is the province of the ALJ to reconcile inconsistent medical opinions in reaching
a determination.  20 C.F.R. § 404.1527(c)(4).  The factors the ALJ should consider in
weighing medical opinions include (1) whether the source has examined the claimant; (2)
whether the source has treated the patient; (3) whether an opinion by a treating physician

20

is supported by medically acceptable clinical and laboratory diagnostic techniques; (4)

length of the treatment relationship and the frequency of examination; (5) the nature and

extent of the treatment relationship; (6) the extent to which the opinion is supported by

relevant evidence; (7) the consistency of the opinion with the record as a whole; and (8) the

specialization of the source of the opinion.  20 C.F.R. § 404.1527(d).  The ALJ's

determination that Dr. Essig's opinion should be preferred over Dr. Ramos's reflects the

ALJ's consideration of relevant factors at  20 C.F.R. § 404.1527(d) and is supported by

substantial evidence, especially in light of factors 5-8.  Caldwell's objections to the contrary,

therefore, are not well-taken.

Caldwell also argues that the ALJ erred in adopting Dr. Essig's opinion but failing to

consider all the limitations described in that opinion.  In particular, Caldwell asserts that the

ALJ adopted Dr. Essig's opinion of April 21, 2004 yet failed to consider Dr. Essig's

assertion that Caldwell required an afternoon break every two hours, could not push or pull,

and could only occasionally reach.  Tr. at 365.

In adopting the opinion of Dr. Essig, the ALJ wrote the following:

Accordingly, the undersigned accepts the conclusions of Dr. Essig in Exhibit 15F
and finds the claimant retains the residual functional capacity for the full range of
sedentary exertion.  In that exhibit, the specialist opined that the claimant remained
able to lift and carry 10 pounds occasionally and five pounds frequently, stand and
walk one hour without interruption, sit throughout an 8-hour workday, frequently
handle, feel, and use the hands for fine and gross manipulation, and occasionally
reach.  He placed preclusions against postural activities (i.e., climbing, balancing,
stooping, crouching, kneeling, and crawling) and against working around heights,
moving machinery, and in extremes of temperature.

Tr. at 18.  The ALJ's opinion includes a limitation for only occasionally reaching; it does not

contain a limitation for required afternoon breaks or a preclusion against pushing or pulling.

Thus, although Dr. Essig's adopted opinion does not allow Caldwell to perform the full

range of sedentary work, the ALJ determined Caldwell's disability status using a table which assumes that Caldwell *can* perform the full range of sedentary work.  The ALJ erred, therefore, in using Table 1 to determine if Caldwell were disabled.[3]

As previously described, this case must be returned to the ALJ to determine whether Caldwell is able to ambulate effectively as defined by § 1.00B2b.  Once that determination is made, the ALJ must formulate a complete and coherent hypothetical question, one which includes all of Caldwell's limitations as described by Dr. Essig, and pose that question to a vocational expert.  Until this is done, it cannot be said that the ALJ's opinion is supported by substantial evidence.

VII.  Decision

For the foregoing reasons, the Court vacates the decision of the Commissioner and remands the case to the ALJ (1) to determine whether Caldwell is able to ambulate effectively as defined by § 1.00B2b and (2) to include all of Caldwell's limitations in a proper hypothetical to a vocational expert.

IT IS SO ORDERED.


/s/ Nancy A. Vecchiarelli
U.S. Magistrate Judge

Date: April 14, 2008

───────────────

[3]  The ALJ's question to the VE was unintelligible.  The ALJ could not have reasonably relied on it in reaching his decision.

22